

**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**TAWANA C. MARSHALL, CLERK**
**THE DATE OF ENTRY IS**
**ON THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 24, 2014**

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| RODNEY WAYNE WILSON and | § | CASE NO. 11-50396-rlj-7 |
| DONNA LYNN WILSON, | § | |
| | § | |
| DEBTORS. | § | |

## MEMORANDUM OPINION

The chapter 7 case trustee, Myrtle McDonald, requests the Court's permission to sell by auction 200 membership units of Texas Star Refreshments, LLC ("TSR"); the units are evidenced by Certificate No. 4 in the name of the debtor, Rodney Wilson. *See* Trustee's Motion to Sell [Docket No. 242]. Wilson opposes the sale, contending the sale is subject to valid transfer restrictions in the company agreement for TSR. Wilson also notes that he claimed the units as part of his exempt property with an assigned value, in light of allowable debt against TSR relative to its assets, of $0.00. David Rogers, another member of TSR, also objects to the trustee's proposed auction. Rogers submits that as another member and interest holder of TSR, he may invoke the same restrictions cited by Wilson, which, in effect, afford him the first right to

purchase the units at a price offered by an outside bidder. Rogers also notes that he and other members of TSR were not provided with timely notice of *any* sale by the trustee. Custom Food Group, LP ("CFG"), a creditor of the Wilsons (and of TSR), favors the auction; CFG made an initial offer of $7,500 to purchase the 200 units, which offer triggered the trustee's proposed auction.

The Court has authority to decide this matter under 28 U.S.C. §§ 1334(b) and 157(b)(2); this matter constitutes a core proceeding as it concerns the administration and sale of an estate asset.

I.

The Wilsons filed bankruptcy under chapter 11 of the Bankruptcy Code on October 4, 2011. Their filing was precipitated by an approximate $910,000 joint and several judgment obtained by CFG against TSR and the Wilsons. TSR, likewise in response to the judgment, filed chapter 11 a few days earlier on September 21, 2011. The Wilsons and TSR submitted and sought confirmation, jointly, of their respective chapter 11 plans at a hearing held in October 2012. By its Memorandum Opinion issued on March 22, 2013, the Court approved confirmation of the TSR plan but denied confirmation of the Wilsons' plan. As the Court noted, the Wilsons' plan was dependent upon confirmation of the TSR plan as TSR served as the source of compensation to the Wilsons. *See* Court's Memorandum Opinion entered March 22, 2013 [Docket No. 128]. Confirmation of the Wilsons' plan was in large part denied because it failed to comply with the so-called absolute priority rule.[1] As the Court explained in the Memorandum Opinion, the real question was whether the absolute priority rule applied; if it did, there was no

---

[1]The absolute priority rule is set forth at § 1129(b)(2)(B) of the Bankruptcy Code and, as applied here, meant that the Wilsons could not retain all of their property without paying their creditors in full.

dispute that their plan violated the rule because it did not provide for payment in full of all unsecured creditors, particularly CFG. The argument was made that the absolute priority rule had been abrogated as to chapter 11 debtors that are "individuals." The Court correctly predicted that the Fifth Circuit would hold that the absolute priority rule was not abrogated as to individual chapter 11 debtors, as was argued by the Wilsons. *Id.* at 31–32; *see also In re Lively*, 717 F.3d 406 (5th Cir. 2013) (holding that the absolute priority rule, though slightly modified by amendments to the Bankruptcy Code, still applies to chapter 11 cases of individuals).

A.

Since confirmation of the Wilsons' chapter 11 plan was denied and the *Lively* case apparently foreclosed their efforts to submit a confirmable chapter 11 plan, the Wilsons, on September 27, 2013, converted their case to chapter 7. Myrtle McDonald was appointed as the chapter 7 trustee.

As a result of the TSR plan, as confirmed, Wilson retained a 20% interest in TSR. This interest, specifically identified as the 200 units represented by Certificate No. 4 in Wilson's name, is an asset of the Wilsons' chapter 7 bankruptcy estate, subject to the trustee's administration. This assumes that the 200 units are of sufficient value, after allowable exemptions, to justify their administration by the Trustee. The Wilsons listed the 200 units as exempt under § 522(d)(5) of the Bankruptcy Code; they stated, however, that the 200 units—their 20% interest in TSR—had zero value.[2] No objections were lodged to the Wilsons' exemption claim.

On April 14, 2014, the chapter 7 trustee filed her motion seeking authority to sell the 200

---

[2] Section 522(d)(5) is the "wildcard exemption" which allows an individual debtor to exempt any property under the unused portion of the homestead exemption at § 522(d)(1). In reviewing the Wilsons' exemptions, it appears they had exhausted such unused portion in other exemption claims.

- 3 -

units. The motion recited that she intended to sell the 200 units to CFG for $7,500, subject to other competing bids coming in before 5:00 P.M. on May 8, 2014. If at least one competing bid was timely made (of at least $500 more, or $8,000), the trustee proposed to hold an auction among the bidders at a time and in a manner determined by the trustee. The motion contained a notice stating that any objections *to the motion* had to be filed by May 8, 2014. Given the objections by Wilson and Rogers, hearing was held on the motion.

In accordance with the TSR plan, 60% of the membership units in TSR—20% to each of the three owners, Wilson, Rogers, and Mike Harris—were assigned to CFG as collateral for its claim. The pledge agreements provided that the pledged units are subject of a junior security interest in favor of the First Bank and Trust. *See* CFG's Exhibit G. Wilson, Rogers, and Harris, as grantors of the security interests, may not further encumber the units or dispose of the units without CFG's consent. *Id.* The pledge agreement identifies the three certificates held by Wilson, Rogers, and Harris, respectively, as Certificate Nos. 4, 5, and 6, representing 200 shares each. *Id.* Counsel for TSR also confirmed with counsel for CFG that Certificate No. 7 represented 400 shares owned by David Hilliard, who, per the TSR plan, contributed capital for his 40% interest. In addition, a copy of a blank Certificate No. 8 was provided to counsel to reflect that no other units were outstanding.

Wendell Holloway, the representative of CFG, understood that CFG was receiving a pledge of 60% of the outstanding units of TSR.

B.

The original company agreement of TSR, dated January 20, 2010, and the one in place at the time TSR filed chapter 11, reflected that the managers and members were Mike R. Harris, Rodney W. Wilson, and J. David Rogers. *See* Debtors' Exhibit A. They each signed the

- 4 -

agreement and each owned 333 1/3 units, or 33 1/3% of the total outstanding units.  *Id*.

David Hilliard acquired his 40% interest upon his contribution valued at $110,000.  The subscription agreement for his purchase is dated January 1, 2013.  *See* Debtors' Exhibit B.

The company agreement was amended and restated on January 1, 2013.  *See* Debtors' Exhibit C.  It is signed by Harris, Wilson, and Rogers on behalf of TSR; they, along with Hilliard, each signed it in their individual capacities, as well.  The restated company agreement states that Harris, Wilson, and Rogers each own 20% of TSR, with each holding 333 1/3 units; it states that Hilliard owns 40% of TSR from his 666 2/3 units.  *Id*.  The stated number of units owned is wrong, however.  The newly issued unit certificates, issued in accordance with the TSR plan, reflect that the original owners, Harris, Wilson, and Rogers, each own 200 units, with Hilliard owning 400 units.  Such ownership matches the stated percentages of the ownership for each, with Hilliard receiving the larger share for his infusion of capital as was contemplated by the TSR plan.  There are no other certificates issued.

The company agreement for TSR, both the original agreement and the amended and restated company agreement, provides the structure, makeup, and mechanics of the LLC.  It sets forth TSR's purpose to conduct a lawful business; provisions regarding the managers of the LLC—their rights, duties, potential removal, and replacement; requirements regarding regular and special meetings of the company; the identity and ownership (by units and percentage) of the member-managers and how their capital accounts are created and accounted for; provisions regarding the transfer of a membership interest; and events causing dissolution of the company, procedures for liquidation, and other issues arising in the event of dissolution.  *See* Debtors' Exhibit C.

Of particular concern here is Article VII, which addresses potential transfers of a

member's interest. *Id.* at Section 7.01. The transfer provisions provide that any member who seeks to transfer his interest must first provide written notice to the other members of the proposed transfer. *Id*. The other members then have the option of acquiring the interest proposed to be transferred at "a price equal to the lesser of the Book Value of the Interest and the amount offered by the proposed transferee." *Id*. The "Book Value of the Interest" is a defined term and must be determined by a Certified Public Accountant. If multiple non-transferring members seek to acquire the interest, they do so on a pro rata basis. *Id*. The company agreement does not require additional capital contributions or loans by the members.

## C.

Holloway testified that he is an active buyer and seller of companies, that he has significant experience and is knowledgeable about the vending sales business. He acknowledged that TSR and CFG are competitors in the Lubbock market. Despite the significant debt against TSR—the $910,000 obligation to CFG and the secured debt to its operating lender—Holloway testified that TSR's equity units have substantial value. He assigned a rough value to the company by multiplying its gross revenues, approximately $2.2 million, by $0.65 to $0.85, and then subtracting the major debts against the company. By doing so, he estimated that Wilson's 20% interest had a potential value of $100,000.

Concerning the trustee's proposed auction, Holloway testified that though he favors the auction as the best way to achieve the highest value for Wilsons' units, he prefers that one of the other members make the ultimate high bid. CFG, therefore, would not be in the position of an interest holder in TSR.

In the thirteen months that TSR has operated under its confirmed plan, it has made all

payments required of it to CFG.

Wilson, as President of TSR, testified that TSR has assets of $498,000 and liabilities, not including CFG, of $564,000. With the large liability of CFG, he submits that TSR has an atypical and unusually heavy debt load. This is a plausible assessment given that the CFG liability arose not from operations but from the judgment obtained by CFG on account of TSR's and the Wilsons' misdeeds.

TSR is a new, closely held business; its prospects over the long haul are such that it is impossible to assign *a value* to the company that is based on revenues going forward. The Court concluded that the TSR plan was feasible, but notes that it is a company still fraught with risk and uncertainty. The Court discredits any assessment of current value that is based on the present financial circumstance of TSR.

David Rogers testified that he did not receive notice from the trustee of her proposed sale of the Wilson units. He further testified that he was not otherwise aware of the sale in time to meet the deadline for competing bids. The trustee confirmed that she did not send her notice to Rogers or the other interest holders. Despite this, Rogers said he was willing to waive the notice deficiency if allowed to match the CFG bid of $7,500 as he would be allowed to do under the transfer provisions of the company agreement.

By the March 2013 Memorandum Opinion, the Court determined that if TSR's plan failed, its likely scenario was liquidation with no return to unsecured creditors, including, obviously, CFG. With respect to CFG's motives at confirmation, the Court stated as follows:

> CFG . . . is . . . a competitor to TSR. CFG has not, within the context of any of its objections, raised a scenario by which it will be paid any of its judgment by TSR. TSR does not have the ability to simply payoff CFG. It does not have the ability, as a still somewhat fledgling company that is already significantly leveraged, to obtain

> financing to payoff CFG. Its assets are entirely encumbered. If its plan fails, the likely scenario is liquidation, in which case CFG recovers nothing on account of its judgment. In short, CFG's position reveals that its real desire and indeed the way in which it benefits the most is by TSR's liquidation. Now, given the judgment it obtained, CFG essentially argues that TSR should not be given an opportunity to reorganize. CFG's interest is therefore different from that of other unsecured creditors, who have approved of the TSR Plan given it provides for payment in full of their claims. TSR's trade vendors, in addition, have an interest in continuing to sell their products to TSR, just as TSR has a business need to continue purchasing their products. The separate classification of trade vendors from CFG is reasonable and proper. *See In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109, 113–14 (Bankr. N.D. Tex. 2002) (citing *In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1167 (5th Cir. 1993)); *see also In re Premier Network Servs., Inc.*, 333 B.R. 130 (Bankr. N.D. Tex. 2005). "A non-creditor interest can justify separate classification if it gives [the creditor] 'a different stake in the future viability' of [the debtor] that may cause it to vote for reasons other than its economic interest in the claim." *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 632 F.3d 168, 174 (5th Cir. 2011). CFG's objections and its vote disavow a sincere interest in collecting some or all of its claim.

March 2013 Memorandum Opinion at 18–19.

II.

A.

The trustee proposes to auction-off Wilson's 200 units to realize their value as an estate asset. Her motion identifies the 200 membership units that are subject of the auction; she does not propose to sell any particular allocable interest or set of interests represented by the units—such as economic, management, voting, right to information, etc. The trustee simply wants to sell what she can sell to liquidate the units' value; she has not articulated a particular legal claim or theory to justify her proposal. CFG, the largest creditor by far in the case, favors the trustee's proposed sale and, in doing so, sets forth its arguments to support its request that the trustee's proposed sale be allowed to proceed from, first, the private sale to CFG to an auction between it and the members of TSR. Wilson, the debtor, though conceding that the trustee may

attempt to sell his 200 units, despite his exemption claim, submits that CFG's bid of $7,500 is not a true value for the units as such bid is motivated by CFG's desire to commit mischief for TSR as a competitor with CFG. CFG obviously denies this charge.

David Rogers, as another member of TSR, is aligned with Wilson, as is TSR itself. Rogers and TSR submit that the transfer restrictions in the company agreement apply to any proposed transfer or assignment of a member's units and that such restrictions grant the other members the first right to purchase Wilson's units at the lesser of CFG's bid price of $7,500 or the book value as defined in the company agreement. Rogers then takes this one step further and proposes that he simply match CFG's offer of $7,500, and, in so doing, he waives any problems regarding notice of the sale as well as any right to purchase for book value (which he submits is probably zero).

B.

*If* either of the company agreements that were admitted into evidence apply, *and if* the restrictions contained within either of the company agreements, which restrictions are identical, are controlling upon the trustee's proposed sale, the Court finds no reason not to approve Rogers's proposal. CFG, however, makes multiple arguments why neither the company agreement nor the restriction on transfer of members' units should apply here.

CFG first submits that there is no valid and controlling company agreement because the most recent and restated company agreement misstates the number of units owned by the members and is thus rendered invalid, and, regardless, the restated company agreement and what it supposedly effected was not specifically approved by this Court. This argument attempts to avoid the Wilsons' specific claim that the restrictions are controlling because the Texas Business

Organizations Code specifically endorses such restrictions.[3] CFG then responds that such provision applies to corporations only and not to LLCs. This argument assumes that there is an effective company agreement; it does not address the validity of such restrictions in company agreements *for LLCs*. It means, apparently, that they do not have the same imprimatur of importance as does a similar restriction in the bylaws of a corporation. As a follow-on argument, CFG contends that Texas case law supports the notion that such restrictions should not be slavishly enforced as a way to prevent an involuntary sale such as the trustee's proposed auction here. At a minimum, according to CFG, Texas law authorizes an assignment of the economic benefit to be derived from the 200 LLC units: whatever that is may be sold by the trustee.

Finally, CFG makes the alternative argument that the company agreement is deemed rejected under § 365(d)(1) of the Bankruptcy Code by the trustee's failure to timely assume the agreement as an executory contract.

C.

The Amended and Restated Company Agreement of TSR is dated January 1, 2013, which is well after TSR's plan was filed and after the confirmation hearing on its plan; it, however, predates the Court's Memorandum Opinion of March 22, 2013, which approved the TSR plan. The only material difference between the restated company agreement and the original company agreement is the addition of David Hilliard's interest in TSR. The subscription agreement reflecting Hilliard's $110,000 contribution for a 40% interest is also dated January 1, 2013. *See* Debtors' Exhibit B. The number of units reflected as obtained by Hilliard is 666 2/3 units or

---

[3]Section 21.211, contained in Title 2, Chapter 21 of the Texas Business Organizations Code, provides that reasonable restrictions on the transfer of a security of a corporation are valid, including restrictions that require the holder to first offer the security to other holders.

40% of the total units issued. *Id*. But the actual units reflected by the certificate issued to Hilliard, dated April 12, 2013, after confirmation, represents 400 units of a total of 1,000 issued units. *See* CFG's Exhibit H.

Hilliard made his contribution before the TSR plan was approved by the Court. It also appears that, for some reason, TSR decided to issue a total of 1,000 units rather than 1,666 2/3 units. Under either scenario, the original members were to each hold 20% and Hilliard 40%.

The Court fails to appreciate why an easily corrected number in a company agreement cannot be easily corrected without disavowing the agreement. No authority has been provided to the Court that addresses the necessity of invalidating the existence of any company agreement. To further bolster their argument, CFG notes that the cancelled unit certificates contain a legend referencing the restrictions concerning the units, but the newly issued certificates do not contain such legend. CFG is simply wrong on this point, however. The restrictions are referenced on the face of each of the newly issued certificates and state in italics as follows: "Transfer of these Units is subject to restrictions in the Operating Agreement/ Company Agreement/ Regulations for this Limited Liability Company." *Id*. Concerning the restrictions and, particularly, proper notice of the restrictions to potential purchasers of units, perhaps the most obvious point is that sale of the units to CFG has not been effected and, regardless of the existence of the legend on the certificate, CFG has certainly been made aware of the restrictions during these proceedings.

The parties' arguments regarding the applicability or not of the endorsement for such restrictions under the Texas Business Organizations Code is not helpful. The issue is whether the restrictions here, in an LLC, are enforceable. No argument is made that the restrictions are generally unenforceable. Upon a review of Title 3 of the Texas Business Organizations Code,

which applies to LLCs, the Court finds no provision that limits their use or allowance. The Court notes further that membership units in an LLC may be assigned, but the assignment does not entitle the assignee to participate in management, to become a member, or to exercise the rights of a member. *See* Tex. Bus. Orgs. Code Ann. § 101.108 (West 2014). The assignee is entitled to an allocation of the economic attributes—income, gain, loss, distributions, etc.—but only to the extent that such benefits have been assigned. *Id*. § 101.109. An assignee may become a member on approval of all members. *Id.*

A further review of chapter 101, applicable to limited liability companies, reveals that an LLC may, after formation, issue membership units to any person with approval of all members, *id*. § 101.105, and the membership interests may be subject to a charging order upon application of a judgment creditor of a member. Such charging order is a lien on the interest that cannot be foreclosed but does entitle the lienholder-creditor to receive any distribution to which the judgment debtor would be entitled. *See id.* § 101.112. The charging order is the exclusive remedy by which a judgment creditor of a member may satisfy a judgment out of the membership interest. *Id*.

Without the restrictions, it appears that the trustee may sell an interest in Wilson's units to CFG that would then allow CFG to recover certain economic benefits attributable to Wilson's 20% interest.

CFG contends that *the trustee* is an assignee of Wilson's interests in TSR and that, as an assignee, is subject to § 101.108 of the Texas Business Organizations Code ("TBOC"). This means, according to CFG, that the trustee holds Wilson's rights to distributions that derive from his membership interest generally—his 20% interest. As a result, the trustee can sell such distribution rights. The Court does not agree with this analysis. Section 541(a) of the

Bankruptcy Code expressly provides that "all legal or equitable interests of the debtor in property as of the commencement of the case" constitutes estate property. *All* interests attributable to Wilson's ownership in the units pass to the estate for administration by the trustee upon the bankruptcy filing. The trustee, then, is subject to applicable law, here the TBOC, concerning any proposed sale or transfer of Wilson's units. The TBOC provides that any assignment of a member's interest grants to the assignee limited rights, i.e., the assignor's allocation of economic benefits, to the extent such items are assigned, and rights to reasonable information and inspections concerning transactions and books and records of the company. *See id.* § 101.109. And to reiterate, the TBOC also provides that a judgment creditor of a member may, upon application by the creditor, obtain a charging order which creates a lien against the interest, but one that cannot be foreclosed; a charging order is the exclusive remedy that a judgment creditor has against a member's interest.

D.

The transfer restrictions contained in the company agreement here limit Wilson's and thus the trustee's ability to sell the units, but they also provide that Wilson, as a member, could transfer the entirety of his interests represented by the units. The transfer restrictions specifically state that they apply to "all or any portion of the Member's entire membership interest" and a "membership interest" is defined to mean such "Member's interest in profit and loss, capital, management, right to vote, and any other interest provided in the Company Agreement to such Member." Debtors' Exhibit C, Section 7.01. The transfer by a member of the entirety of such member's interest is, of course, subject to the other provisions contained in the company agreement that dictate that other members have a first right to purchase the units at the lesser of

the proposed purchase price or the defined book value (which, as applicable here, is assumed to be zero). This option, CFG contends, undermines any sale. This is a legitimate concern in light of the assumed book value of the units.

The question is whether or to what extent the transfer restrictions should apply. Their effect, as strictly applied, appear to prevent the trustee from recovering anything for the 200 units. This is unfair, especially given the rights of a judgment creditor to impose a charging order on the 200 units. Here, however, the trustee seeks to sell the units; she is not asking for a charging order or seeking to sell an asset that is subject of a charging order. As a bankruptcy trustee, she is required to administer the asset—to reduce it to money in a manner as expeditiously as is compatible with the best interests of all parties. *See* 11 U.S.C. § 704(a)(1).

The Court does not construe the company agreement to be an executory contract and thus rejects CFG's alternative position that the company agreement here is deemed rejected by the trustee's or the Wilsons' failure to timely assume the agreement. First, neither the trustee nor the other members, i.e., the parties to the agreement, contend that the agreement constitutes an executory contract. Second, all the parties here, including CFG, were parties to the confirmation hearing on the chapter 11 plans of both TSR and the Wilsons; no party then took the position that TSR's company agreement was an executory contract. The Wilsons serve as the day-to-day managers of the company. The other members are mostly passive investors who do not involve themselves in the day-to-day operations of the business. By the terms of the company agreement, they are each designated to "serve as Manager until he fails or ceases to act." Debtors' Exhibit C, Section 5.01. The members, subject to the requisite votes, are each granted certain powers—to manage the company, to enter into contracts, to take certain actions

concerning major transactions of the company or significant changes in the company's structure. *See* Debtors' Exhibit C. They are not obligated to make additional capital contributions. They in essence have the right to participate in the business and affairs of the company, but are not required to do so. The Court does not consider such rights as executory duties giving rise to an executory contract. *See In re Smith*, 185 B.R. 285 (Bankr. S.D. Ill. 1995); *In re Garrison-Ashburn, L.C.*, 253 B.R. 700 (E.D. Va. 2000); and *In re Ehmann*, 319 B.R. 200 (Bankr. D. Ariz. 2005).

The trustee should be able to realize fair value for Wilson's 200 units in TSR. The transfer restrictions in the company agreement, as applicable here, potentially undermine this goal. Rogers's proposal—to waive the option to purchase at book value—addresses this problem. The other members' right to match a proposed purchase by CFG or other third party does not prevent the trustee's ability to obtain fair value. In fact, the Court is not offended by the $7,500 purchase price.

E.

A bankruptcy court has considerable discretion in approving sales by trustees and is "granted ample latitude to strike a balance between fairness, finality, integrity, and maximization of assets." *In re Farmland Indus., Inc.*, 289 B.R. 122, 126 (B.A.P. 8th Cir. 2003) (court affirmed bankruptcy court's decision to approve revised bidding process over objection of high bidder where party with first right of refusal had not received notice of sale). The Court may determine the proper notice and opportunity for a hearing on a sale. *In re Texas Rangers Baseball Partners*, 431 B.R. 706, 710 (Bankr. N.D. Tex. 2010). "[I]t is clear the court may regulate the mechanism of a sale outside the ordinary course . . . ." *Id*. In doing so, the Court "should

consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) (quoting *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)).

Given the considerations here—the nature of the asset as defined by state law; the terms of the company agreement, particularly the transfer restrictions; the motivations and intentions of the parties here in their respective roles as members or creditors; and the procedures employed thus far, with their accompanying notice problem—the Court will authorize the trustee's sale of Wilson's 200 units. The nature of the interest sold is defined by the Texas Business Organizations Code as it applies to the assignment or transfer of a member's interests in a limited liability company. The sale shall be made by sealed bids to be submitted at a time and location as directed by the trustee. The members of TSR shall be provided notice of the sale and an opportunity to bid; the members of TSR may match the high bid as provided for in the company agreement.

The Court will prepare an order in accordance with this Memorandum Opinion.

### End of Memorandum Opinion ###